MacARTHUR CONCRETE PILE & FOUNDATION CO. v. SIMPLEX
CONCRETE PILING CO. et al.

(Circuit Court of Appeals, Third Circuit. January 27, 1916.)

No. 2002.

PATENTS ⊘⟶328—INVENTION—CONCRETE PILES AND PROCESS OF MAKING SAME.
The Shuman patents, No. 739,268, for a process of making concrete
piles, and No. 733,288, for a removable pile for forming concrete piling,
are void for lack of invention in view of the prior art.

Appeal from the District Court of the United States for the District
of Delaware; Edward G. Bradford, Judge.

Suit in equity by the Simplex Concrete Piling Company and the
Simplex Foundation Company against the MacArthur Concrete Pile
& Foundation Company. Decree for complainants, and defendant ap-
peals. Reversed.

For opinion below, see 227 Fed. 107.

Melville Church, of Washington, D. C., for appellant.

Howson & Howson and Charles Howson, all of Philadelphia, Pa.
(Hubert Howson, of New York City, of counsel), for appellees.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit
Judges.

BUFFINGTON, Circuit Judge. This case involves the use of ce-
ment to form building piles, and is an instance of one of the many new
uses to which cement has lent itself, owing to that plastic capacity by
which it may be carried to any desired point, and to its hardening ca-
pacity by which it is there converted into a solid structure. These
qualities of temporary plastic movement and permanent solidity led
to its substitution for stone masonry to form piers for buildings. To
that end holes of a desired depth and area were dug, and into the
hole was poured or grouted cement, which at once hardened and
formed the pier. If it was desired to carry the pier above ground, a
frame pattern of the desired size was used. If walls, instead of piers,
were desired, long trenches were dug, and the entire underground
foundations of buildings were made from cement. In the same way
cellar walls were built, the cement foundation trenches being carried
below the cellar floor, and from there upward the outside of the cellar
wall was formed against the earth and the inside against a frame box-
ing. If the ground excavated was liable to cave, the obvious rem-
edy was to shore it by an interior structure. From the use of cement
piers as a foundation to buildings, it was to be expected the building
art would naturally advance to deeper foundations, in the shape of
piles.

Such advance is happily illustrated in the Journal of the Royal
Institute of British Architects for 1894. Before quoting from that
article, and leaving the cement art, we may say that the oil and gas
drilling art had thoroughly developed the whole subject of underground
drilling, and the casing or sheathing of drilled holes for hundreds and

⊘⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

indeed thousands of feet underground, so that such wall-protected hole afforded ingress and egress for drilling tools, sand bailers, fishing tools, pump rods, and also for the location within such casing of an inner tubing, which cased or sheathed a hole of still smaller diameter beyond where the casing of the larger dimension ended. The general features of this well-developed drilling art are outlined in a decision in this circuit in 1892, reported in Masseth v. Palm (C. C.) 51 Fed. 824. Returning to the article in question, printed and illustrated below, we see how underground cement piers were made:

"From F. De J. Clere (F.), Wellington, N. Z.

"Though Wellington, N. Z., is one of the best situated capital cities in the world as a commercial distributing center, it has had the great drawback of possessing but little level land for building purposes within reasonable distance of its wharves and jetties. This being the case, reclamation has been resorted to, and the best sites, extending over many acres, were a few years ago covered with the water of the harbor to a depth of from 12 to 15 feet. The material used, for reclamation was loose rock and clay taken from the hillsides in the vicinity, and offers a poor foundation for brick buildings. Generally piles of Podocarpus totara (a very lasting timber) have been driven to a solid bottom and then covered with concrete. Some 14 years ago the acting colonial architect, Mr. Burrows, used concrete piles as a foundation for the Supreme Court building, but for some reason or another the experiment was not repeated until a few months ago, when my firm again used the same materials for the foundation of a four-floored brick warehouse for Messrs. Sharland & Co. Whether our modus operandi was the same as that of Mr. Burrows I cannot say; but, feeling that our experience might be of service in other cases, I am venturing to send you this record of the matter. The building we were to erect was a wholesale drug store, 100 feet long by 40 feet wide, and having three floors above the ground, the walls being of brick of ordinary thickness, resting on a good concrete foundation, which rested in its turn on concrete piles. The 'plant' required to put these piles in position consisted of two steel 'cylinders' as sketched, a wooden 'dolly' of Australian iron bark, an ordinary derrick and 25 cwt. monkey, and donkey engine and winch, and for each pile a cast-iron shoe (weighing 72 pounds each), formed as shown in fig. 1.

"After excavating for the concrete footings the shoe of the pile was placed in position, and the cylinder lowered onto it; a small portion of sand was then thrown in to form a cushion for the 'dolly,' and a 'grummet,' or ring of rope, was placed between the top ring on the 'dolly' and the top of the cylinder, in order to prevent the jar burring the latter. The whole pile was then driven in the ordinary way two feet into the solid original bottom of the harbor, and the 'dolly' withdrawn from the cylinder and the next cylinder driven. The first cylinder was then pumped dry and filled with concrete, and by means of a rope passing through blocks hung above it, and carried to winch of donkey engine, the cylinder was drawn, and the semi-liquid concrete left in the ground in the

FIG. 1.

shape of a pile about 13 inches in diameter. The second cylinder was then treated in the same way. The piles in the long stretches of walling were spaced about three feet apart and arranged as in Fig. 2; but when they had to be closer we found it necessary to leave the cylinders in the ground, as the power at the contractor's disposal was not sufficient to draw them out of the lightly compressed soil.

FIG. 2.

"These cylinders, having to be driven only once, were made of thinner material than the rest. It should be noted that as the concrete had to spread out as the cylinder was drawn, a 12-foot long cylinder was required to make a 10-foot long pile; and I would here note that the reason why the second cylinder was driven before the first one was drawn was in order to prevent the soft concrete in the latter from being damaged by the pressure of the second cylinder.

"The stuff used for the reclamation being porous, we found that the tide rises and falls in the trenches as in the harbor; hence the necessity of pumping out the cylinders, and it was very noticeable that at high tide the cylinders were much more easily drawn than at low. The number of piles driven in a day averaged seven."

From this article, which was in substance republished in this country in the Engineering Record of December 29, 1894, it will be seen that the driving of holes for subterranean piles, the leaving in the hole of a therewith driven casing, or the withdrawing of the same and the filling of the hole or casing with cement, was a well-understood and successful practice in the art. Nor was the art confined to land. It was a common practice to build cement piers in water as a support for bridges, wharves, and the like, by first constructing a cofferdam, pumping the water therefrom and constructing a cement pier within the cofferdam.

So also the use of submarine piles was well developed, as will be seen by reference to Queensland patent No. 1,025 of 1890, granted to French for "improvements in the construction of piles and mode of driving hollow piles and the formation of concrete pillars thereby." In his specifications, the patentee states his invention relates to piles used either on land or water and that his "invention consists essentially in a hollow pile having a strong metal shoe, and although many forms of piles may be adopted, the principle remains the same, and by describing one form of pile, other forms will be readily understood." French's drilling device was a conical-shaped, cast-iron shoe with a hollow cup on its upper side, on the bottom of which hollow the driving stem or "dolly" struck. To this shoe the sheet iron cylinders are attached in one of several suggested ways, and as it receives the impact of a monkey or weight dropped from the ordinary pile driving derrick, the shoe, accompanied by the attached casing, is driven into the ground. "When driven to a desired depth, the 'dolly' is withdrawn and the pile filled up with concrete." It will thus be seen that French's construction left both the casing and the pointed shoe in the ground, where they became a part of the pile, while in Clere's device the shoe and the casing could be left in the ground, or the casing could be withdrawn and nothing left in the ground but the pointed shoe. Upon his device the broad claim was given to French for "the formation of concrete pillars

by means of hollow tubing or casing driven in the manner hereinbefore described, which when driven are afterwards filled up with concrete."

From this it will be seen that the preliminary driving of holes in the ground as a location for subsequently locating piles was well understood, and the use of cement as a filling for such holes was also understood and practiced. In this developed state of the art, the present patentee, Shuman, applied for the patents here involved. They are divisional applications—No. 739,268, granted September 15, 1903, being for a process of making concrete piles, claims 1, 3, 9, and 10 being here involved; No. 733,288, granted July 7, 1903, being for a removable pile for forming concrete piling, claims 5 and 9 being here involved. A study of these patents shows that in process, drilling means, or cement piles in place, Shuman disclosed nothing novel. His pile, when in place, was simply the solidified cement, which hardened in the hole made by French and Clere. The hole in which he placed his cement was no different from theirs, the casing could be withdrawn, left in for part of the depth, or for all of it. In all three the method of pouring in the cement was the same.

As we have said, the disclosures in the patent are simply of things well known in the art. For example, he says his invention relates to "that method of forming piles of cement or concrete which consists in first driving a preparatory pile into the ground, then withdrawing said preparatory pile, and then filling the opening formed thereby with concrete or cement in fluid or plastic form, which when it becomes set forms the permanent pile." His stem or "dolly," which he calls a preparatory pile, "is in the form of a metal tube, although it may be a solid pile of wood or metal." This stem is "provided at the top with a suitable driving head 2 and at the bottom with a point 3, which in the present instance is detachable from the pile." The point is "also of so much greater diameter than said pile 1 that there is no likelihood of the latter coming into contact to any material extent with the walls of the opening formed by driving the pile," and "the withdrawal of the pile is also facilitated, since such withdrawal is not interfered with by frictional hold of the earth upon the pile." The stem and the casing combine to prevent "access of water or silt to the opening formed on said preparatory pile in the firm ground beneath or for preventing the caving in of the walls of the opening when the latter is being formed in unstable ground. The specification further says:

"When the desired depth of opening has been formed, the pile 1 can be withdrawn, leaving the point 3 at the bottom of the opening."

The point may be either attached to the stem, in which case it can be withdrawn, it can be unattached to the stem, or it can be rivetted to the casing, in which latter event it will remain in the hole. The specification closes with this statement:

"I prefer in all cases to remove the cofferdam casing from the opening after the withdrawal of the preparatory pile, so that the concrete of which the permanent pile is composed will directly engage the earthy walls of the opening. Such withdrawal of the cofferdam casing is permitted, even when the nature

of the ground is unstable, by first filling the concrete into the lower end of the cofferdam and then withdrawing the latter, either slowly and continuously, or intermittently, a little at a time, so as to permit the concrete to flow out from the lower end of the cofferdam into the opening above the point *3*; sufficient head of concrete being always maintained in the lower end of the cofferdam to prevent any caving in of the walls of the opening as said cofferdam is withdrawn."

To our mind, it is clear that in none of these statements is any patentable difference or advance over French's and Clere's practices shown. The main difference is the point of engagement between the stem end and the cast-iron driving shoe. In French the upper side of the shoe is cup-shaped, and in this cup the stem enters and strikes on the cup bottom. Thus French in his patent says his shoe is "a cast-iron shoe *D* pointed like a Paliser shell and slightly larger than the pile at its greatest diameter." In Clere's device the shoe is cup-shaped also, and the stem or "dolly" enters this cup and strikes the bottom; a thin layer of sand being thrown in to cushion the blow. In Shuman there is a reversal in these engaging elements; the cup or hollow being placed in the stem and a shoulder raised on the solid shoe adapted to enter the hollow of the engaging stem. That this construction is mechanically better than Clere or French is apparent. The shoe, being subjected to the driving blow, is the part under greatest strain. Putting a deep hollow in such cast-iron shoe necessarily weakened it. Clere recognized this, and minimized it by a slight layer of sand to deaden the jar of the stem blow. By transposing the engaging elements, and placing his cup cavity in the stem, and thus substituting a solid for a hollowed point, Shuman made a mechanical, but not an inventive, improvement. Indeed, we are satisfied that, had the patent authorities been advised of the state of the working art, as shown by French and Clere, Shuman's patents would never have been granted.

We are therefore constrained to hold the claims before us are invalid, and to remand the case to the court below, with directions to enter a decree dismissing the bill.